E. Constantin, Jr. and Ruth F. Constantin v. Commissioner.
Constantin v. Commissioner
Docket No. 95445.
United States Tax Court
T.C. Memo 1966-27; 1966 Tax Ct. Memo LEXIS 254; 25 T.C.M. (CCH) 166; T.C.M. (RIA) 66027; January 31, 1966
*254 Petitioner, an independent oil producer, made substantial advances of funds on behalf of his brother, Jules, who was his manager of production, to pay for Jules' share in acquiring, developing or operating certain oil and gas leases. Such advances were made to Jules on an open account for over a period of about ten years prior to Jules' death in 1953. No notes or other evidence of indebtedness were signed by Jules; there was no provision for interest or collateral; and no definite understanding as to the method or time for repayment. In 1958 the executors for the estate of Jules finally declined to recognize petitioner's request for repayment of the aforesaid advances, they having previously advised petitioner in 1955 that the claim was barred by limitations. Petitioner wrote the account off on his books in 1958 and in his Federal income tax return for that year claimed a bad debt deduction in the amount of $120,846.95 pertaining to "Uncollectible Accounts-Lease Operations". Respondent disallowed $117,184.47 of this claimed deduction because petitioner neither established that the indebtedness existed nor that it became worthless in 1958. Held: Petitioner failed to prove thathe *255 and his brother intended to create a debtor-creditor relationship with respect to the advances or that they became worthless in 1958, and, therefore, petitioner is not entitled to a bad debt deduction under section 166 I.R.C. 1954. [1]
Jack Gray Johnson, 1700 Mercantile Bank Bldg., Dallas, Tex., and Robert L. Blumenthal, for the petitioners. James F. Hart, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined a deficiency in the income tax of petitioners for the taxable year 1958 in the amount of $62,551.77. The only issue presented is whether petitioners are entitled to a business bad debt deduction in the amount of $117,184.47for *256 the taxable year 1958, or in the alternative, to a nonbusiness bad debt deduction for that year. Findings of Fact Some of the facts have been stipulated and the Stipulation of Facts, together with the exhibits attached thereto, are incorporated and made a part of our Findings by this reference. Petitioners, E. Constantin, Jr., and Ruth F. Constantin, are husband and wife residing in Dallas, Texas. They filed a joint Federal income tax return for the calendar year 1958 on the cash basis with the district director of internal revenue at Jackson, Mississippi. Ruth F. Constantin is a petitioner herein only because petitioners filed a joint return for 1958, and hereinafter E. Constantin, Jr., will be referred to as the petitioner. Since 1942, petitioner has been engaged in the oil and gas business as an independent oil producer and oil refiner. He has conducted these businesses in corporate, partnership, and individual forms in New Mexico, Texas, Arkansas, and Mississippi. Petitioner employed between 300 and 400 employees, including his brother, Jules Constantin. As manager of production for petitioner, Jules' duties consisted of overseeing the drilling, equipping, completionand *257 operation of oil and gas wells. Jules had management authority over many of petitioner's employees. Jules died on January 2, 1953, and was survived by his wife, Sally, and two sons by a prior marriage, James A. and Harry L. Constantin. Jules Constantin and W. H. Rogers, Jr., jointly purchased oil and gas properties in which they each owned a 50 percent interest. Said venture was carried on the books of petitioner as the "Constantin and Rogers" account. The petitioner, Jules, W. H. Rogers, Jr., and Charles Else jointly purchased oil and gas properties in which Jules owned a 2/9th interest and the petitioners owned a 3/9th interest. Said venture was carried on the books of petitioner as the "CCE&R" account. Jules, the petitioner, A. A. Spencer, and W. H. Rogers, Jr., jointly purchased oil and gas properties in which Jules owned an interest. Said venture was carried on the books of petitioner as the "CCS&R" account. The properties on which most of the advances here involved were made were those owned jointly by Jules and W. H. Rogers, Jr. Approximately 25 wells were drilled on these properties. All of the properties were operated by petitioner, acting for the respectivejoint *258 co-owners. With the exception of stock in the Paluxy Asphalt Company, all of the property owned by Jules at his death, including all of the oil and gas properties involved herein, constituted community assets of Jules and his wife, Sally. The petitioner maintained books and records for the period 1943 to 1958, inclusive, on which were recorded various charges and credits pertaining to advances made by petitioner on behalf of Jules and other joint owners for acquiring, developing, equipping, or operating the oil and gas leases. A summary of 17 different ledger accounts which pertain to advances made by petitioner on behalf of Jules and the Estate of Jules Constantin, Deceased, during said periods shows the following: (a) the name of the account to which it pertains, (b) the total charges and total credits, by calendar year, which were recorded in such account, and (c) the net debit or credit balance reflected by such account at the end of each calendar year of its existence through September 30, 1958. Included among the charges to the Jules Constantin Account (J. Constantin Estate Account after the death of Jules Constantin), as reflected in said summary, are thefollowing *259 charges for expenditures made by petitioner on behalf of Jules during the period 1943 through 1952, but not made for acquiring, developing, equipping or operating oil and gas leases: (a) Various telephone and tele-
graph expenses
$ 460.50
(b) Various automobile expenses
of Jules Constantin
126.25
(c) Various automobile expenses
of Harry Constantin, son of
Jules Constantin
568.11
(d) March 15, 1943 - Check No.
6704
500.00
(e) June 22, 1943 - Draft
488.02
(f) Nov. 15, 1950 - Check No. 8586
1,000.00
(g) Dec. 11, 1950 - Check No. 8741
1,000.00
$4,142.88
Except for the aforesaid amount of $4,142.88 expended for personal items and described hereinabove, all of the charges in all of the accounts reflected in the 17 summaries of petitioner's books and records represent expenditures made by petitioner on behalf of various parties (including Jules and the Estate of Jules Constantin) for acquiring, developing, equipping or operating various oil and gas leases. The following listing sets forth, as to each of the 17 accounts summarized, that portion of the balance in such account at January 3, 1953, and at September 30, 1958, which representedunrecovered *260 and unreimbursed expenditures which were made by petitioner on behalf of Jules and the Estate of Jules Constantin, Deceased (except that the credit balance in the last account, Schedule 17, represents to the extent of such balance a recovery in excess of expenditures in such account): Schedule
No.
Account
1/3/53
9/30/58
1
J. Constantin & W. H. Rogers, Jr.
$ 28,438.88
$ 29,534.27
2
Constantin & Rogers - Archer County
24.88
24.88
3
J. Constantin & W. H. Rogers - Eastland County
874.41
874.41
4
J. Constantin & W. H. Rogers - Cora Roberts A.
Cora Roberts B.
12,821.37
12,821.95
5
Constantin & Rogers - Throckmorton County
9.20
9.20
6
J. Constantin & W. H. Rogers - Oklahoma Opera-
tions
1,220.83
1,220.83
7
J. Constantin & W. H. Rogers Whit Lease -
Falls Co.
1,132.18
1,133.05
8
J. Constantin - Padgett & Wilkinson
13,756.58
10,788.00
9
C.C.E. & R.
16,982.91
0
10
C.C.E. & R. Equipment
13,276.64
0
11
J. Constantin Estate - C.C.E. & R.
0
29,567.51
12
Jules Constantin Account (J. Constantin - Estate
Account after death of Jules Constantin)
22,360.55
20,290.19
13
E. Constantin III & J. Constantin
0
0
14
Constantin, Constantin, Spencer & Rogers
12,577.74
0
15
J. Constantin - C.C.S. & R.
0
12,577.74
16
J. Constantin Swabbing
403.36
403.36
17
Jules Constantin Carey-Thompson
(2,329.80)
(2,329.80)
Net Total
$121,549.73
$116,915.59
*261 Note (1): The Jules Constantin portion of the Schedule 9 and Schedule 10 accounts was transferred to the Schedule 11 account during 1955. Note (2): The Jules Constantin portion of the Schedule 13 account was transferred to the Schedule 12 account during 1951. Note (3): The Jules Constantin portion of the Schedule 14 account was transferred to the Schedule 15 account during 1955. Note (4): All of the above balances at September 30, 1958, represent expenditures made prior to September 30, 1956, except for the following amounts in the J. Constantin & W. H. Rogers, Jr. Account, Schedule 1: 1956 (after Sept. 30th)
$ 346.57
1957
1,489.14
1958
1,141.27
Total
$2,976.98
The amounts listed hereinabove under the 9/30/58 column, totaling $116,915.59, were charged off by petitioner on his books and records on September 30, 1958. together with an additional amount of $268.88 not there listed. Jules did not sign any notes or execute any written instruments pertaining to the advances made to him or on his behalf by petitioner. Also, there was no understanding or arrangement for the time of repayment or the payment of interest with respect to said advances. Petitioneremployed *262 a younger brother, Charles, at a lower level than Jules in petitioner's organization, and petitioner made no advances or expenditures on behalf of Charles. The last will and testament of Jules was filed with the County Clerk, Dallas County, Texas, on January 14, 1953, and was admitted to probate. Said will contained the following provisions: * * *
III. I declare that all of the property owned by me at this time, with the exception of certain stock in the Paluxy Asphalt Co., a corporation, is the community property of myself and my wife Sally Constantin, and it is my intention that this will, as to our joint property, shall dispose only of my community half interest. IV. As to the stock in the Paluxy Asphalt Co., it is my separate property, and I here and now bequeath one-half of same to my wife Sally Constantin, during her lifetime; and the other one-half to my sons James A. Constantin and Harry L. Constantin, share and share alike. Upon the death of said Sally Constantin, the half interest willed to her shall pass to and vest in my sons, James A. Constantin and Harry L. Constantin, or to their heirs, share and share alike. V. The present home of myselfand my wife *263 Sally Constantin, located at No. 5212 Farquhar Lane, in the City of Dallas, Dallas County, Texas, together with all of its contents, and all household and kitchen furnishings, all automobiles that we may own, and all cash in the banks or banks, I will and bequeath to my wife Sally Constantin, in fee simple. In connection with this bequest of the home, I wish to suggest that my beloved wife might better dispose of this big house and estate and purchase a smaller one of her choice, for the reason that the upkeep of our present home is very high and probably will continue so. VI. I will and bequeath to my wife Sally Constantin, the income from my estate, during her lifetime, to the extent of Seven Hundred and Fifty ($750.00) Dollars per month, so that with her community half interest she will have a monthly income of at least Fifteen Hundred ($1500) Dollars per month. VII. Subject to the other terms and provisions of this will, the balance of my community estate I will and bequeath to my two sons James A. Constantin and Harry L. Constantin, share and share alike. In this connection I further provide that should my son, Harry L. Constantin die without issue, thenhis portion of *264 my estate shall vest in his wife as long as she lives or does not remarry; and when either of the last two mentioned contingencies arise, then Harry L. Constantin's remaining interest in my estate shall pass to and vest in my son, James A. Constantin, or his heirs. VIII. At the present time all of my community property, other than the home, household furnishings, cars, cash and personal effects, consist of various kinds of oil and gas properties, held jointly with either W. H. Rogers, Jr. or my brother Eugene Constantin, both residents of Dallas, Texas. And I direct that my executors hereinafter named, advise at all times with said W. H. Rogers, Jr. and/or Eugene Constantin, concerning my interest in said jointly held properties. I further direct that if either the said W. H. Rogers, Jr. or Eugene Constantin should desire to sell their interests in said jointly held properties and to include my interest in such sale, that my executors as such, and as individuals after my estate is closed, either join in such sale, or purchase the other parties' interest within seven days after a bonafide offer has been received, which the other party is willing to accept. And inorder to effectuate *265 this provision, I hereby give and grant to my said executors all such powers as may be necessary to carry out such sale, and to execute and deliver each and every legal paper necessary or required to completely sell and convey my interest and to pass a good and valid title to any such purchaser. IX. I direct that my executors hereinafter named shall pay out of my estate to Mary Fennell, mother of my wife Sally Constantin, the sum of One Hundred Fifty ($150.00) Dollars per month as long as she lives; and at the time of her death my estate shall also pay all the cost and expense of a decent Christian burial for said Mary Fennell. X. I nominate and appoint by belovered wife, Sally Constantin and my two sons, James A. Constantin and Harry L. Constantin, as joint INDEPENDENT EXECUTORS and EXECUTRIX (for convenience herein referred to as "executors") of my estate, and I direct that no bond shall ever be required of them as such, and that no action shall be taken in the Probate Court, other than to file, prove and record this will, and return an inventory, appraisement and list of claims. And in the event of the death of either of said three executors, the survivoror survivors shall *266 have full authority to carry out the provisions of this will. XI. It is my wish, and I do so here and now declare, that any action taken by my executors shall be unanimous, to be effective; but that acting unanimously they shall have and are hereby given full, ample and complete power to handle my estate, in the manner herein set forth, carrying out the bequests herein made, and with authority to enter into contracts and to execute same as well as all necessary deeds, leases, oil and gas leases, assignments, bills of sale, mortgages, deeds of trust, oil payments, transfer orders, division orders and all other papers, legal or otherwise, of every kind and character, without restriction or limitation. Letters testamentary were issued to Sally, James A. and Harry L. Constantin as joint independent executors and executrix on January 29, 1953. A Federal estate tax return was filed on behalf of the estate of Jules with the district director of internal revenue at Dallas, Texas, on April 6, 1954. On April 9, 1954, the executors filed their Affidavit for Inheritance Tax Appraisement with the County Court, Dallas County, Texas. Both of these documents listed the accountsdue petitioner *267 as debts of or charges against the Estate of Jules Constantin, deceased. Information in the return and affidavit pertaining to assets and liabilities of the estate was furnished by the petitioner and by W. H. Rogers, Jr., above-mentioned, who was a lawyer and had been employed by petitioner during the period from 1943 through 1958. The Federal estate tax return valued the community assets of the decedent and reported one-half of such assets for estate tax purposes. The following schedule sets forth the various assets and liabilities of the estate as reported in the Federal estate tax return: Schedule
Decedent's One-half
ASSETS
Values on 1-3-53
Per Return
Community Interest
Real Estate
$159,398.25
A
$ 79,699.13
Stocks & Bonds
50,323.00
B
25,161.50
Mortgages, Notes Cash
42,093.00
C
21,046.50
Insurance
27,000.00
D
13,500.00
Miscellaneous Property
12,912.69
F
6,456.40
Total
$291,726.94
$145,863.53
Schedule
Decedent's One-half
LIABILITIES
As of 1-3-53
Per Return
Community Interest
Administration Expenses
$ 2,000.00
J
$ 1,000.00
National City Bank of Dallas: Montgomery Davies and Ryan-
Mitchell Note
24,612.56
K
12,306.28
Laney Note
13,961.21
K
6,980.60
Wilkinson Note
12,837.63
K
6,418.82
E. Constantin, Jr.
Regular Account
36,444.01
K
18,222.01
One-half Constantin & Rogers
Account
44,332.10
K
22,166.05
Two-ninths, C.C.E. & R. Ac-
count (Dean "C" Lease)
20,179.10
K
10,089.55
One-fourth, C.C.S. & R. Ac-
count
12,588.68
K
6,294.34
Paluxy Stock Demand Notes
9,226.71
K
4,613.35
Republic National Bank, Dallas,
C.C.E. & R. (2/9ths)
31,100.01
K
15,550.00
Atlantic Life Insurance Company-
House Note
9,058.31
K
4,529.16
Harry L. Constantin
8,793.34
K
4,396.67
James A. Constantin
3,495.38
K
1,747.69
Miscellaneous Open Accounts
7,473.20
K
3,736.60
Total
$236,102.24
$118,051.12
*268 The liabilities listed in Schedule K of the Federal estate tax return and Schedule D of the Texas Inheritance Tax Affidavit included the debts claimed as a bad debt deduction by petitioner and involved herein. At the time the petitioner made advances on behalf of Jules and the other joint owners, the oil and gas properties were considered by the petitioner to be "proven" and had "only one chance in a thousand of failing to make a well." After Jules' death, W. H. Rogers, Jr., served briefly as the attorney for the estate. About six to nine months later, Bedford Wynne was employed to represent Sally and the estate of Jules. Said estate is presently in administration. Wynne had numerous conversations pertaining to petitioner's claim with respect to the advances made on behalf of Jules, and at no time did he ever acknowledge the validity of the alleged debt. Petitioner communicated with Wynne on numerous occasions pertaining to the alleged debt and was consistently advised by Wynne that it would not be honored until proof of the debt in the form of a written instrument or promissory note signed by the decedent was presented. On October 13, 1955, Wynne sent a letter to petitioner, *269 which read, in part, as follows: * * *
I have received the information sent by Mr. Stembridge to me at your request, and the information is as complete that way as he could possibly get it. It appears to me that legally most of these claims are barred by the statute of limitations, and if there was to be any recognition of these claims; it would have to be by the Executors themselves because as I have stated above I believe that a big majority are barred by the statute of limitations. My report to the Executors would be just that. I will take the matter up with Mrs. Constantin, but until she and the boys agree to these claims, I would have to turn them down. * * *
Neither petitioner nor anyone representing him ever produced any written statement, note or other evidence to substantiate the open account claim nor was any legal proceeding ever brought against the estate of Jules or against Sally to prove or collect the alleged debt. The normal 2-year statute of limitations on the alleged open account debt ran no later than January 29, 1955, which date was two years after letters testamentary were issued to the executors named by Jules' will. After the death of Jules theestate *270 only made payments to the petitioner for current operating expenses of the various oil ventures and never made any payments on any amounts allegedly due petitioner for advances made prior to Jules' death. Neither did the three executors of Jules' estate ever acknowledge to petitioner or any one acting in his behalf that the alleged debt would be recognized, honored or paid. On April 11, 1957, the estate of Jules paid to petitioner the amount of $12,797.98 due on two promissory notes which Jules had signed in 1950 with respect to certain stock in the Paluxy Asphalt Company. Included with said payment Wynne sent petitioner a letter, which reads, in part, as follows: * * *
I enclose herewith the Estate of Jules Constantin, Deceased, Checks No. 181 and 182, check 181 being for $10,866.03 and check 182 being for $1,931.95. These cover the Paluxy stock which J. Constantin signed notes on September 18, 1950 and November 1, 1950 for $1,386.71 and $7,840.00 on the respective dates. These notes are, of course, both barred by the statute of limitations, but as the Executors realize that this was an obligation of the Estate, they certainly wanted to pay it. * * *
On June 2, 1958, petitioneradvised *271 Wynne by letter that unless arrangements were made to recognize and pay his open account claims against the estate of Jules Constantin he would have no alternative but to institute proper legal proceedings. On July 10, 1958, Wynne mailed a letter to petitioner which reads, in pertinent part, as follows: * * *
I have discussed with Mrs. Sally Constantin your letter of June 2, 1958, concerning the indebtedness of the Estate of J. Constantin to you. It is apparent that the statute of limitations has run on all of the accounts except as to the current account. I explained this to Mrs. Constantin and she has stated that because of the running of the statute of limitations, she declines to recognize your claim as being legal and collectible. She therefore declines entering into any kind of an agreement or arrangement for the payment of the alleged indebtedness. [Emphasis supplied.] * * *
On August 21, 1958, W. H. Rogers, Jr., a lawyer then still employed by petitioner, advised him as follows: Confirming our discussions over the week-end regarding the indebtedness of J. Constantin, I advise as follows: 1. Sally F. Constantin has, through her attorney, BedfordWynne, *272 advised that she declines to recognize your claims for the accrued indebtedness based upon the statute of limitations. 2. In reviewing the accounts as submitted by the Accounting Department, it is immediately obvious that the great majority, if not all, of such accounts are more than two years old and none are evidenced by written instruments which would extend them beyond the effects of the Statutes of Limitations for that period. s(Emphasis supplied.] 3. Any efforts on your part, by legal steps, to collect such monies would, in all probability, only incur sizable expenditures for court costs, legal fees and attempts to prove the various items of the account; and, in my opinion would, in all probability, result in a decision by the courts to the effect that the great majority, if not all, of such claims are barred by limitation. 4. In view of the above, it is my opinion that the account be cancelled and written off as a bad debt. In their Federal income tax return for the year 1958, the petitioners claimed a deduction against gross income in the amount of $120,846.95 for "Uncollectible Accounts - Lease Operations." Finding of Ultimate Fact The money advanced toJules *273 Constantin by the petitioner and claimed as a deduction on petitioner's income tax return for 1958, did not constitute a debt to petitioner or, even if it were a debt, become worthless in that year. Opinion Respondent determined that the amount of $117,184.47 claimed by petitioners on their income tax return for the taxable year 1958 as a bad debt deduction due from the Estate of Jules Constantin, deceased, was unallwoable because they failed to show that such indebtedness existed and became worthless in 1958. Petitioner, E. Constantin, Jr., in opposition, contends that he is entitled to a business bad debt deduction in the amount of $116,915.59 [2] as a business bad debt under section 166 of the 1954 Code, [3] or, in the alternative, as a nonbusiness bad debt in the taxable year 1958. Petitioner avers that said amount represents the balance of unrecovered loans made by him to his brother, Jules, between 1942 and January 2, 1953, the date of Jules' death. Petitioner argues that the Estate of Jules Constantin was indebted to him in 1958 in the amount mentioned above, $116,915.59; that his basis in this indebtedness was the full face amount; that it was all created in connectionwith *274 his trade or business and that the debt became worthless in 1958 and not prior to that year. Respondent, on the other hand, contends *275 that the claimed deduction is unallowable because no bona fide debt ever existed; that even if an obligation did exist petitioner did not expect repayment unless the operation proved profitable; that petitioner's failure to enforce collection prevents his claiming a bad debt deduction even assuming that a debt existed; that petitioner has failed to prove worthlessness in 1958 and, finally, that even if a bad debt loss in 1958 is allowed it is a nonbusiness rather than a business bad debt. Respondent's determination is, of course, prima facie correct and the burden of proof is on petitioner to demonstrate error in such determination. Welch v. Helvering, 290 U.S. 111 (1933); Harry K. Oliphant, 24 T.C. 744, 749 (1955), affd. per curiam 234 F. 2d 699 (C.A. 5, 1956). Petitioner here has the burden of establishing that (1) there was a debt owing to him by his brother, Jules, and (2) that it became worthless in 1958. Denver & Rio Grande Western Railroad Co., 32 T.C. 43 (1959), affd. 279 F. 2d 368(C.A. 10, 1959); Eugene M. Alexander, 26 T.C. 856 (1956). It is aximatic that among the essential prerequisites *276 for a bad debt deduction are a clear showing that the parties intended to create a debtor-creditor relationship and further that a genuine debt in fact exists. Evans Clark, 18 T.C. 780, 783 (1952), affd. per curiam 205 F. 2d 353 (C.A. 2, 1953); Estate of Carr V. Van Anda, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F. 2d 391 (C.A. 2, 1951); E. J. Ellisberg, 9 T.C. 463, 467 (1947); Luke & Fleming, Inc., 1 B.T.A. 12, 14 (1924); section 1.166-1(c), Income Tax Regs. All pertinent facts and circumstances must be considered, regardless of their objective or subjective nature, and the ultimate question is essentially one of fact. Acheson v. Commissioner, 155 F. 2d 369 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court. In our consideration of the underlying circumstances, we are especially mindful that intrafamily transactions inviteclose scrutiny. Evans Clark, supra, at 783; Estate of Carr V. Van Anda, supra, at 1162; Helen E. Leatherbee, et al., Executors, 34 B.T.A. 196, 200-201 (1936). Preliminarily, we must note *277 that all the circumstances surrounding the existence of the alleged indebtedness herein are vague and indefinite. Over a period of about ten years prior to his death, Jules Constantin, petitioner's brother, purchased, or otherwise acquired, interests in certain oil and gas properties. Most of these properties were jointly acquired by Jules and W. H. Rogers, Jr., and were properties in which petitioner had no interest of his own. About 25 wells were drilled on the properties jointly owned by Jules and W. H. Rogers, Jr. Jules also purchased other leases jointly with the petitioner and other parties which were known as the "CCE&R" and the "CCS&R" ventures. Petitioner alleges that he advanced money on behalf of Jules from 1942 to 1952 to pay for Jules' share of the cost of acquiring, developing, and equipping the properties in which his brother had an interest, and that said advances constituted bona fide loans. Analysis of the record before us reveals thatall the usual indicia of bona fide indebtedness are absent. Atlhough no one fact is determinative, it is of material importance that no notes were signed by Jules nor any other written evidence that the advances were intended to be *278 loans; there was no provision for interest; no provision for security; no definite understanding as to the method or time for payment; no fixed or ascertainable maturity date; no evidence of an understanding or promise to repay; and, apparently, the parties relied solely on the success of the oil ventures for repayment. See H. Beale Rollins, 32 T.C. 604, 614 (1959), affd. 276 F. 2d 368 (C.A. 4, 1960). Significantly, in 1950 petitioner advanced about $12,000 to Jules with which to purchase some Paluxy Asphalt Company stock and these funds were evidenced by two promissory notes signed by Jules. In 1957 the then lawyer for Jules' estate, Bedford Wynne, informed petitioner that the estate would honor said notes and the estate paid petitioner the amounts due thereon. While the advances on said stock are unrelated to the alleged indebtedness with which we are concerned here, it is odd, we think, that petitioner would require Julesto sign notes with respect to the advances of $12,000 on the Paluxy stock and not have him sign any notes or execute any document pertaining to the advances in dispute, which amount to over $120,000, and which were allegedly made over *279 a period of ten years. Admittedly, petitioner treated the aforesaid advances on his books and records as "accounts receivable," and credits were made on such open accounts for several years. However, we are entitled to look beyond the forms and terms employed by the parties. It is well established that book entires, although evidentiary of the facts they purport to record, are not conclusive, and may not be used to conceal realities. Doyle v. Mitchell Bros. Co., 247 U.S. 179 (1918); Richardson v. Commissioner, 264 F. 2d 400, (C.A. 4, 1959), affirming in part a Memorandum Opinion of this Court, Bennett E. Meyers, 21 T.C. 331, 334 (1953). The 17 summaries of the ledger accounts submitted by petitioner show that he kept only one account pertaining to advances made on behalf of all persons associated with each particularventure. These summaries show the portion of the balance in each account at January 3, 1953, and at September 30, 1958, which represent unrecovered and unreimbursed expenditures which were allegedly made by petitioner on behalf of Jules and the Estate of Jules Constantin, Deceased. We find no separate accounts receivable ledger *280 in the name of Jules with respect to the advances in controversy. Nor can we discern from the aforesaid summaries the particulars of the advances on behalf of Jules, such as the date and amount of each of the advances, and the date and amount of any credits thereto. Likewise, although credits are shown, there is no indication of the source of such credits on the summary. Thus, the books and records do not themselves establish or show that the balances due on the various accounts, even if we were to conclude that they sufficiently established a "debt," were due from Jules. Also, in connection with other records or acknowledgments of the advances in question, we believe that the filing of the Federal Estate Tax Return and the Texas Affidavit for Inheritance Tax Appraisement with the County Clerk in Dallas County, Texas, by the Estate of Jules Constantin, Deceased,in which the advances to Jules were listed as debts, is not determinative of the issue. These documents were prepared and filed in 1954 with information furnished by petitioner and his attorney, Rogers. No doubt at that time it was thought that the accounts on petitioner's books reflected debts of the decedent. However, we *281 are not convinced by this evidence and the other evidence before us that a debt has been established. Manifestly, the entire transaction involved herein is far afield from the normal debtorcreditor relationship. The difficulty in determining what petitioner and his brother actually intended with respect to the advances under review results from the informality and indefiniteness with which the advances were made and the manner in which records thereof were kept. Even petitioner's testimony does not establish that Jules ever agreed or promised to repay petitioner's alleged advances to him. Respondent suggests that the advances, if made, represented gifts by petitioner or additional compensation to a valuable employee. We do not deem it necessary or desirable to characterize the alleged payments. Suffice it to say that viewing the evidence in its entirety, we areconvinced that petitioner has failed to establish that the Estate of Jules Constantin was indebted to him for the so-called advances in 1958. Furthermore, we agree with respondent's argument that petitioner had no intention of enforcing collection of the so-called loans. See Jacob Grossman, 9 B.T.A. 643, 644 (1927). *282 Rather than intending the creation of bona fide unconditional indebtedness, we view the evidence as establishing that petitioner was simply making accommodation advances to Jules' oil and gas ventures out of a commendable fraternal and employer's interest in furthering Jules' economic welfare. Petitioner admittedly was interested in Jules' developing an estate of his own and having a "nest egg" over and above his salary. [4] At most, the evidence establishes that petitioner might expect and require repayment if the venture paid off. However, the evidence does not establish whether or not these conditions were ever met, or when or if petitioner was entitled to repayment. *283 Assuming arguendo that an obligation to repay the advances existed, we do not believe petitioner is entitled to the deduction in dispute since the time and method for repayment was indefinite, ambiguous, and conditional. Where there is a promise to pay from a particular fund or source that is to be created in the future, such as profits from oil and gas operations, the creation of the fund is a condition precedent to an obligation to pay the promisor. If the event never comes into existence, the promise to pay is unenforceable. See Zimmerman v. United States, 318 F. 2d 611 (C.A. 9, 1963), affirming 209 F. Supp. 312 (D. Hawaii, 1962); Gulf Pipe Line Co. v. Nearen, et al., 138 S. W. 2d 1065, 1068 (Tex. Civ. App. 1940); City of Seymour v. Municipal Acceptance Corporation, 96 S. W. 2d 814, 816 (Tex. Civ. App., 1936). In our view, the lack of a relatively fixed date upon which petitioner could have demanded a definite sum, regardless of the profits earned by a particular oil and gas venture or by any of the drilling projects in general, strongly indicates that petitioner's advances were not bona fide debts. See Farley Realty Corporation v. Commissioner, 279 F. 2d 701 *284 (C.A. 2, 1960), affirming a Memorandum Opinion of this Court. Although Jules had other assets and sources of income, the record shows that if Jules were to reimburse petitioner, the funds would be derived mainly from the successful operation of certain leasehold interests owned by Jules for which the funds involved herein had been advanced by petitioner. Petitioner, on cross-examination, testified that he expected to be repaid from these particular interests. There is no affirmative evidence that said advances were to be repaid regardless of the productivity of the oil and gas ventures, or if the money for repayment was to come from other assets owned by Jules, at a reasonably fixed maturity date. It is apparent that if petitioner expected to be repaid at all, he was looking only to the income to be produced from the oil and gas properties and never intended to hold Jules personally liable in all events for the advances. In this connection, petitioner testified that the properties purchased by Jules were a "cinch to produce" and had onlyone chance in a thousand of failing to make a well. Petitioner also testified that Jules' leasehold interests were "proven properties that had more *285 than enough oil to pay for the recovery of the development plus what the parties owed me." Apparently, the right to repayment was conditioned upon the profitable exploitation of the oil and gas properties in which Jules had interests. See Evans Clark, supra, at 783. It is significant that petitioner never even suggested in his testimony that Jules agreed or promised unconditionally to repay the advances. Likewise, petitioner did not ever make demand for repayment from Jules during his lifetime. Even if we assume that some sort of an indebtedness existed, the attempted deduction thereof in 1958 is unallowable. Petitioner has failed to meet his burden of proving worthlessness in 1958. After the death of Jules in 1953, petitioner was not diligent in enforcing his claim and did not exhaust the ordinary means available to him for collecting the alleged debt. Such inaction on the part of petitioner lends support to our view that there never was a debt in the first instance, or if an obligation did exist, that he decided to foregocollection and attempted to recoup a large part of it through a tax deduction. A tax-payer-creditor may not for personal reasons decline to enforce *286 a valid claim against a responsible individual or firm and then urge that he sustained a business loss which the Government should share with him in a favorable tax year. H. D. Lee Mercantile Co. v. Commissioner, 79 F. 2d 391, 393 (C.A. 10, 1935), affirming a Memorandum Opinion of this Court; Earl V. Perry, 22 T.C. 968, 974 (1954); C. S. Webb, Inc., 1 B.T.A. 269 (1924). The record shows that after the death of Jules in 1953 up until July 10, 1958, (when petitioner was notified in writing that Sally Constantin refused to acknowledge his claim) the three executors of the estate of Jules never formally recognized the validity of the alleged indebtedness to petitioner. Also, the attorney for the estate, Wynne, consistently maintained that petitioner's own books and records were not sufficient to prove the alleged debt and that petitioner would have to present something in writing signed by Jules before theclaim would be honored. The petitioner, on the other hand, knew Jules had not signed any notes or executed anything in writing to evidence the alleged loans. Thus, petitioner knew from the beginning that it was not possible for him to furnish *287 the proof required by Wynne to establish the debt and receive payment. Notwithstanding this important fact, petitioner took no legal action whatsoever to establish his claim and enforce collection. In our view, a prudent creditor under the circumstances would not sit idly by year after year and take no action to prove or enforce his claim, particularly when it is remembered that the claim was in excess of $100,000. A diligent creditor would have instituted legal proceedings to collect such a large sum of money. We do not mean to imply that a lawsuit is a prerequisite for a bad debt deduction, and respondent's regulations so specify. Section 1.166-2(b), Income Tax Regs. But failure of petitioner to press his claims and exhaust his legal remedies may prevent him from being allowed a bad debt deduction in later years. Edward H. Moore, 22 B.T.A. 366 (1931); see New York Water Service Corporation, 12 T.C. 780, 795 (1949).
There is no affirmative evidence before us to establish that there were not sufficient assets available in Jules' estate to liquidate all or part of the alleged indebtedness to petitioner. We do not understand that *288 petitioner even argues that the claimed debt became worthless in 1958 because the estate was financially unable to pay it that year. The properties against which collection could have been enforced had substantial value and were capable of paying the amount in controversy in full. As indicated by our findings, the Federal estate tax return and the Texas Inheritance Tax Appraisal Affidavit placed a value of $291,726.94 on the community assets of Jules' and his surviving wife as of January 2, 1953. [5] Liabilities, including the debts in controversy, were shown in the total amount of $236,102.24. Thus, there was an excess of assets over liabilities of more than $50,000 and ample assets available to pay the alleged debt of $117,184.47. It is clear that the estate was solvent, in the sense that its assets exceeded its liabilities. Petitioner, however, made no attempt to reach the estate assets, although it is apparent that some of them might be reached. Acheson v. Commissioner, supra, at 371; Allen-Bradley Co. v. Commissioner, 112 F. 2d 333 (C.A. 7, 1940), affirming a Memorandum Opinion of this Court. *289 Instead, petitioner, contends that in 1958 the debt became worthless because the estate advised him in that year that it would not pay the claim and that the statute of limitations would be relied on by the executors. Petitioner also alleges that the debt became "clearly" barred by limitation in Texas in 1958. We think that petitioner has not succeeded in meeting his burden of establishing either that the collection of his claim against Jules became barred by limitations in 1958, or that the specter of its being raised by the estate as a defense first appeared in that year. The record before us leaves much to be desired, but it appears that the Texas 2-year statute of limitations, Vernon's Ann. Civ. Stat. art. 5526, may well have run on many of the advances in question prior to Jules' death. As our findings indicate we haveconcluded that at least by January 29, 1955, two years after the executors of Jules' estate were appointed and qualified, the 2-year statute ran out on the debt in question. While we agree with petitioner that that fact in itself is insufficient to establish worthlessness in 1955, (and we do not understand that respondent contends to the contrary), we cannot *290 agree with petitioner's further contentions. Petitioner makes an interesting and novel argument that because the debts were listed in the Texas Inheritance Tax Affidavit filed on April 9, 1954, the executors revived the debt and extended the statute for four years. He contends on brief that this "may well have extended the statute of limitations for four years - to April 9, 1958." He then concedes, however, that under Texas law executors cannot revive a claim after it has already become barred by the statute and he recognizes that there is a question that the statute "was not still open on the entire indebtedness on April 9, 1954." Various other arguments and contentions about the limitations question and the facts of record are made. Respondent urges that petitioner was not diligent in enforcing his claim and did not exhaustthe ordinary means available to collect it; that the statute of limitations barred the debt after January 29, 1955, but that even if it was extended to April 9, 1958, as petitioner contends, the deduction should still be denied. Respondent argues that petitioner did not act diligently in protecting his claim whether the statute of limitations ran in 1955 or *291 any subsequent year; that the statute was not extended until April 9, 1958, because the Inheritance Tax Affidavit was not an acknowledgment to petitioner from which a promise to pay can be implied; and that even if the statute did not run until April 9, 1958, as petitioner contends, petitioner could not wait until thereafter to threaten suit and then write off the claim as a worthless debt. We agree with respondent. In order for the taxpayers to gain their deduction for 1958 they must show that the debt became worthless in that year. If it became worthless prior or subsequent to 1958 they cannot be allowed the deduction in 1958. Redman v. Commissioner, 155 F. 2d 319 (C.A. 1, 1946), affirming a Memorandum Opinion of this Court; Eugene M. Alexander, supra. In October 1955, Wynne, the estate's attorney, wrote a letter to petitioner with respect to the advances to Jules which stated that "legally most of these claims are barred by the statute of limitations, and if there was to be any recognition of these claims; it would have to be by the Executors themselves * * *" In this same letter, set forth in our Findings of Fact, Wynne also stated that he would *292 "take the matter up with Mrs. Constantin, but until she and the boys agree to these claims" he would have to turn them down. [Emphasis supplied.] Notwithstanding this admonition in 1955 that the estate would not recognize petitioner's claims because they were then barred, petitioner urges that in 1958, his relatives "unexpectedly" and for the first time asserted the limitations bar to his claims. We cannot agree with these contentions. Viewing the entire record, petitioner has failed to establish either that his claims were first barred by limitation in 1958 or that it was in 1958 that the alleged debtor raised the limitation barrier to his collection thereof. After Wynne's letter of 1955, the estate consistently refused to pay the claim, and demanded written evidence of its existence. Sally Constantin and "the boys" never agreedto recognize the claims as Wynne's 1955 letter indicated they must before it would be honored. Petitioner did talk to one nephew, who was favorably disposed to pay him, but he never even discussed the matter with Sally or Harry, the other two executors. The 2-year statute of limitations having run in 1955, and petitioner having been notified by the estate's *293 attorney that year to that effect, the burden was clearly on the petitioner to justify the charge off of the claims three years later in 1958 by showing either that the statute was tolled and the debt revived or that he had substantial reason to think that he might nevertheless eventually receive payment. Duffin v. Lucas, 55 F. 2d 786 (C.A. 6, 1932). Petitioner has failed to carry this burden. We cannot conclude that the Inheritance Tax Affidavit acknowledged the justness of the debt or constituted a promise to pay it. It certainly was not clearly and unequivocally a promise to petitioner that the claims would be paid. We therefore determine that it was not effective to extend the statute of limitations to 1958. Also, while we recognize that petitioner did persist up until 1958 in attempting to negotiate a settlementof his alleged claims, we can only conclude on the basis of all of the evidence presented that he had no substantial reason to believe that he might eventually collect from Jules' estate. On the contrary, the evidence indicates that petitioner could only reasonably expect that his efforts would avail him nothing. Even if petitioner had carried his burden *294 of establishing that the indebtedness was not barred by limitations until 1958 and the bar was not invoked until that year, we would have to deny petitioner's claimed deduction for other reasons. Petitioner has failed to show that he could not have collected the amounts involved from W. H. Rogers, Jr., and other parties involved jointly in the CCE&R and CCS&R ventures. Petitioner has not shown that he was without remedy to collect the advances from others jointly interested in the various oil ventures. Under the laws of the State of Texas as applied to the particular facts of the instant case, it appears that Jules, W. H. Rogers, Jr., and the other co-owners were jointly and severally liable to petitioner for any advances made to them in acquiring, developing and operating the several oil and gas properties. Munsey v. Mills & Garitty, 283 S. W. 754 (Tex. Comm. App. 1926); Browne v. Sabine Machine & Supply Co., 253 S. W. 2d 713 (Tex. Civ. App., 1952). It does not appear to be necessary in Texas that partnerships for drilling be evidenced by written agreement since the partnership will be implied if the parties jointly acquire and operate the oil and gas properties. *295 Templeton v. Wolverton, 179 S. W. 2d 252, 255 (S. Ct. Tex., 1944). In the instant case Jules and W. H. Rogers, Jr., jointly purchased oil and gas properties and shared profits therefrom. Petitioner, who had no interest of his own in such properties, was engaged by Jules and Rogers to operate the properties for them. Under the circumstances, there was both joint ownership and joint operation of the properties by Jules and W. H. Rogers, Jr., and, thus, a mining partnership by operation of law in the State of Texas. Rucks v. Burch, 156 S. W. 2d 975 (S. Ct. Tex., 1941). If Jules and W. H. Rogers, Jr., were partners, they were both jointly and severally liable for the advances and the petitioner is not entitled to a bad debt deduction until he has proved that thealleged debt was uncollectible from all the parties involved in each of the ventures. Uhl Estate Co., 40 B.T.A. 1223, 1230-1231 (1939), affirmed 116 F. 2d 403 (C.A. 9, 1940). Petitioner has not established by the evidence presented that Jules was solely liable for the unpaid balance due on the advances made to the joint ventures or that petitioner could not collect them from *296 the other joint co-owners who operated the properties through petitioner. In light of all of the foregoing, we must conclude that petitioner has failed in his burden of proving that a bona fide debt existed with respect to the advances involved herein or that such debt, even if it existed, became worthless in 1958 so as to entitle him to the deductions in issue. Accordingly, we need not decide the nature of the indebtedness or whether the alleged indebtedness was a business or nonbusiness bad debt. We must sustain the respondent's determination that neither the existence of the indebtedness nor its worthlessness in 1958 has been established. To provide for any necessary adjustments, Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioners claimed a bad debt deduction on their income tax return in the amount of $120,846.95, but, on brief, claim the lesser amount of $116,915.59, which E. Constantin, Jr., had charged off as a bad debt on his books and records on September 30, 1958. The record does not disclose the reason for the discrepancy in the various amounts. ↩
3. SEC. 166. BAD DEBTS. (1) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and * * *
(2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩
4. In this connection, petitioner attempted to explain the advances as follows: Q. Why did you make those advances on behalf of Jules Constantin? A. Well, I made those advances on behalf of Jules Constantin because he was a valued employee; he was one of my key men; he was considered a top production man; and I wanted to give him an opportunity over and above his salary to develop a little nest egg or an estate so that he could have something - so that I would have no problem in keeping him on the one hand and so that he could have something over and above his salary to rely upon. * * *
Q. Did you have an understanding with Jules Constantin at the time of these advances as to their nature? A. Oh, yes, sir. Q. What was the nature of that understanding? A. Well, the understanding was simply that, as I explained in the beginning, we were offering him these monies, loaning him these monies in order to permit him to develop an estate of his own over and above his salary so that he'd have something to fall back on later on in life.↩
5. Included in community assets in these documents was Paluxy Asphalt Co. stock valued at $48,000 which Jules' will specified as noncommunity property. Against this property were note claims of $9,226.71 included in liabilities.↩