RALPH G. HOLDERNESS and SHIRLEY J. HOLDERNESS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holderness v. Commissioner
Docket No. 7997-73.
United States Tax Court
T.C. Memo 1977-5; 1977 Tax Ct. Memo LEXIS 436; 36 T.C.M. (CCH) 13; T.C.M. (RIA) 770005; January 12, 1977, Filed Joseph Levin, for the petitioners. Joseph Falcone, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency *437 in income tax against the petitioners of $12,992.22 for the taxable year 1968. The following issues remain: 1. Whether petitioners were entitled to deduct certain bad debts in 1968; 2. Whether petitioners were entitled to deduct, as sales promotion and travel and entertainment expenses, amounts in excess of that allowed by respondent; and 3. Whether petitioners' deduction of farm expenses was proper as a loss incurred in a transaction entered into for profit. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife and resided in Vermilion, Ohio, at the time they filed the petition herein. [1]
Petitioner conducted a magazine subscription solicitation business under the trade name Keystone Readers' Service as a regional franchisee of the Perfect Subscription Company (hereinafter Perfect). The solicitation was undertaken by subfranchisees and salesmen of the petitioner (both hereinafter referred to as "salesmen" or "salesman").
*438 Salesmen obtained orders for subscriptions and turned the orders in to petitioner. Payment on these orders would be made by the subscribers at a subsequent date or over time. The salesman who obtained a particular order would receive a percentage commission on the amount that ultimately was paid on the order. If the purchaser never paid anything, the salesman would receive no commission. If the purchaser paid the full amount of the order, the salesman would receive his full commission. Although the commissions were not earned until payments were made on the orders, petitioner made advance to the salesmen at the time the orders were turned in. These advances would either be a flat percentage of the face amount of the orders turned in or a fixed drawing account. In addition, advances were made to help salesmen pay certain of their expenses, including telephone and utility bills, office rent, and car payments. When payments were actually received on the orders, the commission earned was credited against the advance, thereby reducing the amount owed by the salesman to the petitioner. Until the advance was fully repaid, the full commission was credited against the advance. *439 Petitioner claimed and respondent disallowed deductions (representing advances in excess of commissions) as follows: Debtor
Amount
John Hallmark
$1,737.27
R. M. Holderness
2,707.57
James Regan
667.11
Ron Trombly
617.37
William Grant
500.00
H. Converse
300.00
A. N. Holderness
32.18
Before such a debt was written off, petitioner approached the debtor and attempted to convince him to repay the amounts owed. If this proved unsuccessful, petitioner determined whether the debt should be written off on the basis of the following three criteria, each of which had to be satisfied: (1) the salesman's orders had no further amounts payable from which he would earn commissions; (2) the salesman was no longer associated with petitioner's business; and (3) the salesman was either unemployed, could not be located, or other conditions were present which led petitioner to believe that the debt was not collectible. Even where the salesman was no longer associated with petitioner, and where there was no reasonable expectation that the entire debt could be recovered through commissions, no portion of the debt was considered worthless until the entire debt had gone *440 bad. None of the debts in question was turned over to a collection agency, nor was suit brought to collect on any of them. Petitioner made no attempt to discover if the debtor had any assets with which the debt could be repaid. The amount allegedly owed by John Hallmark, a subfranchisee of petitioner whose subfranchise terminated prior to 1967, was evidenced by a note signed by Hallmark on July 15, 1966 in the amount of $5,202.52. On the back of the note, the following typed words appeared: "This note will be paid in full if within 37 months from the date hereof $2,000.00 plus interest is paid to payee." [2] The last communication between petitioner and Hallmark was in 1967. James Regan was a salesman whose working relationship with petitioner had terminated prior to 1968. The last credit of commissions earned on his account was made on November 30, 1967. [3]
*441 Ron Trombly, who apparently sold cookbooks for petitioner, signed two notes in July 1967 to the order of petitioner in the aggregate amount of $325 and three notes to the order of Keystone Readers' Service in the aggregate amounts of $1,014.34. At least one of the notes to petitioner represented a personal loan by petitioner. The last credit to Trombly's account was on December 30, 1968. The amount claimed as a bad debt on the amount owed by Trombly was $617.37. [4]
William Grant, a salesman, signed a note in the amount of $600 on July 10, 1967. Of that amount, $500 was to be used as a down payment on an automobile. A few weeks after the loan was made, Grant disappeared. Credits of earned commissions were made to Grant's account during 1968 but not thereafter. H. Converse received an advance of $500 from petitioner on June 25, 1968. Of this amount, *442 $200 was repaid, the last repayment being made on July 30, 1968. Converse was unemployed at the end of 1968. The remaining amounts claimed as bad debts were owed by R. M. Holderness (Richard) and A. N. Holderness (Arnold), both of whom are brothers of petitioner. Prior to the time petitioner hired Richard, he had been out of work. Included in the advances made to Richard were payments for a washer and dryer, Richard's traffic tickets, newspapers, doctor bills, and rent on Richard's residence. Advances of more than $4,000 were made prior to the time Richard received his first commission. The maximum commissions credited to Richard's account during the entire period of his employment was less than $500. A payment on account of the claimed debit balance was made as late as November 29, 1968. [5]
The only advances made to Arnold were monthly car rental payments in advance for the *443 period from October 19, 1966 to December 19, 1966. Certain credits were made against the advances, leaving a balance of $69.60 as of November 17, 1966. [6]
Petitioner claimed a deduction of $8,054.49 for sales promotion expense and $8,581.26 for travel expense. Respondent allowed $5,988.74 and $3,617.33, respectively, for these items. During 1968, petitioner wrote a memorandum explaining the circumstances relevant to each of such travel and entertainment expenses. Typically, a memorandum would indicate where the activity took place, the names of the people present, what was discussed, and the amount expended. The memoranda for the year 1968 were not produced by petitioner. Some time in 1969, as a result of a dispute, petitioner's office and business was taken over by Perfect.Petitioner's books and records, including the expense memoranda for 1968, remained in the office but were subsequently shipped by Perfect to another location. Petitioner's efforts to find these records have proved fruitless. Petitioner began a farming operation in 1966, at which time *444 he purchased 140 acres of land and a farm house. During 1966, petitioner attempted to raise cattle. In 1967, he sold all of the cattle and decided to breed horses instead. With the assistance of one of his daughters, petitioner performed a great deal of physical labor in setting the farm up in a manner suitable for raising horses and in running the farm so set up.The farm was sold by petitioner in December 1968 because he was required to take a more active role in the operation of his regular business. In 1968, petitioner owned five horses. One of petitioner's daughters took a very active role in caring for the horses. In addition, she rode some of the horses and she showed them in a horse show. Respondent disallowed a claimed loss of $5,808.62 in respect of the farm on the ground that it did not constitute a trade or business carried on for profit. OPINION In disposing of this case, the Court labors under the handicap of an incomplete, inadequate, and confusing record. In part, this appears to be due to a variety of business difficulties and litigation relating thereto which preempted the attention of the petitioner and affected the preparation of this case for trial. *445 Whatever sympathy we may have for petitioner because of these circumstances, such sympathy cannot provide a substitute for the burden which is placed upon him to prove that he has met the requirements of the applicable statutory provisions. See Rule 142 of the Rules of Practice and Procedure of this Court. Against the background of these general observations, we proceed to a consideration of the three categories of deductions which are in dispute, all of which involve issues of fact. Bad Debts
There are three essential conditions to the allowance of a bad debt deduction. (1) There must be a bona fide indebtedness in a proven amount, (2) if the debt arose prior to the taxable year, it must have had a value at the beginning of the year, and (3) the debt must have become worthless during the taxable year for which the deduction is claimed. See Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States, an unreported case ( Ct. Cl. 1964, 13 AFTR 2d 472, 64-1 USTC par. 9213); I. Hal Millsap, Jr.,46 T.C. 751, 762 (1966), affd. on other issues 387 F. 2d 420 (8th Cir. 1968); section 1.166-1(a) and (c), Income Tax Regs. *446 Additionally, where a deduction for a business bad debt is claimed, it must be shown that the debt was proximately related to the taxpayer's trade or business. Except as hereinafter specified, we hold that petitioner has failed to meet his burden of proof that the foregoing elements existed with respect to any of his claimed deductions. With respect to the deductions for the alleged indebtedness on the part of petitioner's two brothers, we have serious doubts as to whether any bona fide indebtedness existed, much less that it was proximately related to petitioner's business, at least as to the major portions of the amounts involved.Such intra-family transactions invite close scrutiny. [7]
We can find virtually no evidence to support a conclusion that a bona fide debtor-creditor relationship was meant to be created at the time the payments to the brothers were made. No notes were signed, nor were any other written instruments executed to indicate the existence of a debt. No firm repayment date or schedule was produced. Admittedly, petitioner recorded these amounts as a loan in his accounts in the same manner *447 as he treated other advances. However, we are not bound by such book entries. Based on the evidence before us, we conclude that petitioner has failed to meet his burden of proof that the payments were made with a real expectation of repayment rather than out of a commendable fraternal interest in the welfare of his brothers. See Elizabeth N. Rude,48 T.C. 165, 172-173 (1967). Even if we were satisfied that bona fide business debts were in fact created, it is clear that petitioner has not carried his burden of proving that they became worthless during the taxable year. Payments were being made by Richard as late as November 29, 1968 and the balance on that date was far in excess of the amount claimed as a deduction. For aught that appears in the record, further payments could have been made after 1968. With respect to Arnold, there is nothing to indicate any activity after November 17, 1966. So far as the record is concerned, any such indebtedness could have become worthless prior to 1968. The remaining debts represent amounts paid as advances to persons who had a business relationship to petitioner against which commissions were charged as earned. In some *448 instances, notes were signed by the debtor evidencing the existence of a loan. Petitioner has persuaded us that these advances were made with the expectation that the full amounts advanced would be recovered from future commissions. Even where recovery is possible solely out of commissions, a valid debt can exist. Clay Drilling Co. of Texas,6 T.C. 324, 331 (1946). Petitioner's method of determining when a bad debt became worthless is open to serious question. His third criterion (see p. 11, supra) essentially rested upon a judgment on his part that the debt was no longer collectible. To the extent that this judgment has a subjective foundation, it must be rejected. Boehm v. Commissioner,326 U.S. 287, 292 (1945). To the extent that it rested on objective facts, the record is simply too meager to permit us to conclude that petitioner has carried his burden of proof. None of the usual elements establishing worthlessness was shown. Petitioner did not turn over the accounts to a collection agency nor did he attempt to sue to recover the amounts owed to him. He did not even investigate whether the debtors had assets with which they could *449 pay the amounts in question. Although it is possible that these debtors had no assets, the burden was on petitioner to establish that fact. Granted that these elements need not be proven in every case and perhaps the degree of such proof should be somewhat less where advances to salesmen in excess of commissions earned are involved, the hard fact is that petitioner's determination of worthlessness was founded on the premise that, if the debtor refused to pay, that was the end of it. This is simply not enough. We see no need to repeat the various factors, set forth in our findings, that lead us to conclude that, with two exceptions, petitioner has failed to carry his burden of proof in respect of the claimed bad debts. We mention a few in passing; (a) As to John Hallmark, the amount of the indebtedness was not proved (see footnote 2, supra). In any event, as far as the record reveals, the indebtedness may well have become worthless prior to 1968. (b) As to James Regan, for aught that appears the indebtedness became worthless prior to 1968, to say nothing of the fact that the amount of the indebtedness, if any, was not proved (see footnote 3, supra). (c) As to *450 Ron Trombly, not only was the amount of the indebtedness not proved (see footnote 4, supra) but it appears that his account was being credited as late as December 1968. (d) As to William Grant, he disappeared shortly after executing the note in July 1967. However, collections were made on this indebtedness during but not after 1968 and by the end of that year Grant's whereabouts was unknown. Although the evidence is meager, we conclude that it is sufficient to carry petitioner's burden of proof as to the claimed deduction as a business bad debt in respect of Grant. See I. HalMillsap, Jr.,supra.
(e) As to H. Converse, much the same situation exists as in the case of Grant except that Converse's whereabouts was known. He was, however, unemployed. Although the evidence is not overwhelming, we are satisfied that petitioner has carried his burden of proof as to the worthlessness of this business bad debt. Travel and Entertainment and Sales Promotion Expenses
Petitioner claimed a deduction for $8,581.26 for travel and entertainment expense, of which respondent allowed $3,617.33. For these additional expenses to be deductible, they must meet *451 the substantiation requirements of section 274(d). [8] The requlations under this section require that petitioner substantiate for each expenditure (i) the amount expended; (ii) the time and place of travel or entertainment; (iii) the business purpose; and (iv) the business relationship to the taxpayer of each person entertained. Section 1.274-5(b)(1), Income Tax Regs.
Petitioner testified that he kept detailed records substantiating his travel, entertainment, and promotional expenditures incurred in 1968, but that these records were misplaced as a result of the transfer of his business to another party. The testimony presented on this point is quite vague, and at times hopelessly confused. We are far from convinced that the circumstances are such as to bring petitioner within the lost records exception contained in section 1.274-5(c), Income Tax Regs.[9]Rodman v. Commissioner,542 F.2d 845 (2d Cir. 1976); Joe F. Gizzi,65 T.C. 342 (1975). But, even if we assume that petitioner is entitled to the benefit of such exception, he cannot *452 prevail. The exception requires a "reasonable reconstruction of his expenditures." (Emphasis added.) The record herein does no more than show that adequate records were kept. This is simply not enough. Petitioner conceded that, with one minor exception, he made no effort to obtain duplicate supporting data from the recipients of the expenditures in question. In support of his claimed deductions, he merely submitted cancelled checks purporting to represent $8,348.16 in travel and entertainment expenses and $2,107.23 in sales promotion expenses for the year 1968. But copies of receipts and cancelled checks without explanation of their business purpose is insufficient. [10]
It *453 is arguable whether the same strict requirements are applicable to the sales promotional expenses, but, as far as this record reveals, such expenses were inextricably mixed up with the travel and entertainment. [11]
In short, *454 this record falls woefully short of establishing expenditures for sales promotion, travel, and entertainment in excess of the amount allowed by respondent. Petitioner has failed to carry his burden of proof and respondent's disallowances are sustained. Farm Loss
Section 165 permits an individual to deduct only those losses incurred in a trade or business or in a transaction entered into for profit. If the farm was operated for recreation or pleasure, no loss deduction is allowed. Section 1.165-6(a), Income Tax Regs.
For taxable years beginning prior to December 31, 1969, the test of whether a farming operation was conducted for profit was whether the taxpayer had a bona fide intention to make a profit and whether he operated the farm in a manner consistent with his expections. See, e.g., Margit Sigray Bessenyey,45 T.C. 261 (1965), affd. 379 F. 2d 252 (2d Cir. 1967). [12]
Among the factors to be considered in deciding whether petitioner *455 had a bona fide intention to make a profit are: (1) his special knowledge and skills relevant to the type of operation conducted; (2) the degree to which he investigated the potential profitability of the operation; (3) the extent to which he employed competent professional help in the operation; (4) the extent to which the operation was run in a businesslike manner; and (5) the personal and recreational aspects of the farm. On the basis of these factors, we conclude that petitioner did not conduct his horse farm with the intention of making a profit. Margit Sigray Bessenyey,supra.[13]
Prior to his purchase of a farm in 1966, petitioner had no experience in the raising of cattle or horses. He decided to begin farming after reading "several articles in the papers and financial papers" and after consulting with E. G. Reed, the general manager of petitioner's business, who also ran a farm. Reed had no experience in the business of breeding, raising, or training horses for profit. Petitioner had at most minimal knowledge of cattle and horse *456 raising and had done virtually no investigation of the potential for profit in engaging in such an activity. At trial, petitioner testified that he and his daughter performed most of the operations around the farm, although a girl from a neighboring farm helped out to some extent. No evidence was introduced that would indicate that petitioner, his daughter, or the girl had the potential to develop a profitable operation. Petitioner also failed to produce evidence that the farm was run in a businesslike manner. Although an accounting firm was employed to set up a system of accounts, it appears that this system was not used. Nor were separate bank accounts for the farm established.
Finally, petitioner's daughter rode the horses frequently and showed them in horse shows. Although it is possible that such activities might be consistent with a profit motive, petitioner has failed to convince us that they were other than purely recreational in nature. Based on the foregoing, we conclude that petitioner has failed to carry his burden of proof that the horse farm operation was carried on for profit. His loss is therefore not deductible. Decision will be entered under Rule *457 155. Footnotes
1. Since Shirley J. Holderness is a party to this action solely by reason of filing a joint return with her husband, Ralph G. Holderness will be referred to as petitioner.↩
2. The record does not reveal how petitioner arrived at the $1,737.27 claimed as a deduction.↩
3. Again, the record does not reveal how petitioner arrived at the $667.11 claimed as a deduction. The transcript of Regan's account shows that Regan may have owed no more than $300 by the end of 1968. The record does not indicate that Regan ever gave petitioner any note or other evidence of the claimed indebtedness.↩
4. We cannot determine from the record how this amount was calculated. Petitioner has submitted certain records pertaining to Trombly's loans, but he has not provided this Court with any indication as to the relationship among the notes, the commissions credited to Trombly, and the other advances made to him by petitioner.↩
5. The record indicates that the debit balance in Richard's account as of November 29, 1968 was $4,229.51. We are unable to determine the correlation between the $2,707.57 deducted and such amount. No note or other evidence of indebtedness appears to have been given by Richard to petitioner.↩
6. The record does not indicate how petitioner arrived at the amount of $32.18 claimed as a bad debt deduction.↩
7. See E. Constantin, Jr.,T.C. Memo. 1966-27↩.
8. All references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
9. Sec. 1.274-5(c)(5). Loss of records due to circumstances beyond control of the taxpayer.↩ Where the taxpayer establishes that the failure to produce adequate records is due to the loss of such records through circumstances beyond the taxpayer's control, such as destruction by fire, flood, earthquake, or other casualty, the taxpayer shall have a right to substantiate a deduction by reasonable reconstruction of his expenditures.
10. See Saul Freedman,T.C. Memo. 1976-332↩.
11. Attached to the exhibits submitted by petitioner were lists of the checks drawn each month, with a very brief description of the alleged business purpose of the expense in question. These descriptions were summary in nature (often limited to such phrases as "travel expenses" or "babysitting") and insufficient to establish whether they were ordinary or necessary expenses of a business. In addition, payments of $2,447.60 to petitioner and $913.09 to E. G. Reed, general manager of petitioner's business, were not explained even in the summary manner described above. Based on the record before us, we are unable to determine the amounts which represent travel and entertainment expenses, those which represent sales promotion expenses, and those which are not properly deductible under either of these categories. We note, however, that petitioner testified that he was much less active in the business in 1968 than he had been in prior and in subsequent years.↩
12. Section 183, which applies to taxable years beginning after December 31, 1969, modifies this test by creating a presumption against the presence of a profit motive when losses occur year after year.↩
13. See also James Coe,T.C. Memo. 1974-129; Joan F. W. Farris,T.C. Memo. 1972-165↩.